**Robert NESBIET, Plaintiff,**

v.

**GENERAL ELECTRIC CO.,
et al., Defendants.**

**No. 04 Civ.9321(SAS).**

United States District Court,
S.D. New York.

March 28, 2005.

Bryan Belasky, Weitz & Luxenberg, P.C., New York, NY, for Plaintiff.

Michael A. Tanenbaum, Sedgwick, Detert, Moran & Arnold, LLP, Newark, NJ, for Defendant.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

On October 26, 2004, Robert Nesbiet ("Nesbiet") sued General Electric Company ("GE") and other defendants in New York state court alleging, among other things, that he was exposed to asbestos-containing products while employed at the Brooklyn Navy Yard, where he worked on the USS Missouri between 1943 and 1944. Nesbiet is suing GE solely on the theory that it failed to warn of the dangers relating to asbestos used as insulation in marine steam turbines manufactured by GE. On November 29, 2004, GE filed a timely notice of removal asserting federal jurisdiction under the federal officer removal statute.[1] Nesbiet now moves to remand this action to state court.[2]

## I. BACKGROUND

### A. Plaintiff's Allegations

Nesbiet's exposure to asbestos occurred, in part, during his employment at the

1. *See* 28 U.S.C. § 1442(a).

2. In addition, GE has moved to stay all proceedings in this Court pending a decision by the Judicial Panel on Multidistrict Litigation on whether to transfer and consolidate this action pursuant to 28 U.S.C. § 1407. This case is scheduled to be considered for transfer to MDL 875, *In re Asbestos Products Liability Litigation,* on March 31, 2005.

Brooklyn Navy Yard, where he worked as a welder and shipfitter during World War II.[3] In October, 2004, Nesbiet was diagnosed with mesothelioma, a cancer of the lining of the lungs caused by exposure to asbestos.[4] GE has confirmed that it manufactured marine steam turbines that were installed on the USS Missouri, a Navy ship that Nesbiet helped construct.[5] Nesbiet has stated that the insulation on these turbines was a source of his asbestos exposure.[6] He alleges that GE failed to provide any warnings regarding asbestos on its turbines.[7] Nesbiet's only claim against GE is for failure to warn about the dangers of asbestos.

## B. Grounds for Removal

In its notice of removal, GE avers that "in the manufacture and sale of turbines and other equipment for the U.S. Navy, including all aspects of warnings associated with those turbines and equipment, GE was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1)."[8] In support of removal, GE has proffered the following evidence.

3. *See* Plaintiff's Responses to Defendant's Fourth Amended Standard Set of Interrogatories and Request for Production of Documents, Ex. C to Certification of Michael A. Tanenbaum, Counsel to GE, in Support of Defendant's Memorandum of Law ("Tanenbaum Cert."), at 24.

4. *See id.* at 9.

5. *See* GE's Notice of Removal ("GE Not.") ¶ 6.

6. *See* Plaintiff's Memorandum of Law in Support of His Motion to Remand at 5 ("Nesbiet Mem.").

7. *See* Weitz & Luxenberg, P.C., Amended Standard Asbestos Complaint for Personal Injury No. 7, Ex. A to Tanenbaum Cert., ¶ 173.

## 1. David Hobson's Affidavits

*First,* GE has submitted four affidavits of David Hobson ("Hobson"), a former GE employee.[9] Hobson began his employment with GE in 1969 and over the course of the following twenty-seven years, "had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and use of marine steam turbines from GE."[10] Prior to his employment by GE, Hobson worked as an engineer at a shipyard and on steam ships, from 1965 until 1969.[11]

The Hobson affidavits show that GE manufactured and supplied turbines for U.S. Navy ships under contracts between GE and the Navy Department or contracts between GE and shipyards that had themselves contracted with the Navy Department.[12] The Navy Department administered these contracts through Navy Sea Systems Command, whose personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all equipment on U.S. Navy ships.[13] This portion of the affidavits is uncontroverted.

8. GE Not. ¶ 6.

9. *See* 10/17/03 Affidavit of David Hobson; 3/31/04 Affidavit of David Hobson ("Hobson 2"); 10/6/04 Affidavit of David Hobson ("Hobson 3"); 2/4/05 Affidavit of David Hobson ("Hobson 4"), Exs. 1–4 to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Remand ("GE Opp.").

10. Hobson 2 ¶ 3.

11. *See id.* ¶ 1.

12. *See id.* ¶ 6.

13. *See id.*

Nesbiet strenuously objects, however, to those portions of Hobson's affidavits regarding the Navy's control over warnings and, more specifically, whether the Navy prevented GE from providing warnings on the dangers of asbestos. Hobson declares, in relevant part:

[T]he Navy had precise specifications as to the nature of any information that was to be affixed to equipment supplied to the Navy by GE. Under the Navy's specifications and procedures, as well as under actual Navy practice as it evolved in the field, GE would not have been permitted to affix any type of warning or caution to a piece of equipment intended for installation onto a naval vessel, beyond those expressly specified by the Navy. The Navy also had precise specifications as to the nature and contents of all written materials that were to be delivered with naval turbines.... These [materials] included safety and hazard information only to the extent directed by the Navy.[14]

Nesbiet argues that this and other similar statements contained in Hobson's affidavits could not possibly be based on Hobson's personal knowledge and, in any case, have no basis in fact.[15] When deposed

concerning the first two of his affidavits, Hobson admitted that he has no personal knowledge concerning the relationship between GE and the Navy prior to 1965; mentoring from the previous generation of GE engineers was his only source of knowledge with respect to the relevant time period.[16] There is no indication that this mentoring included the subject of the Navy's specifications, procedures or practice concerning asbestos-related warnings during World War II.[17] It follows that Hobson lacks personal knowledge as to the Navy's control over such warnings when Nesbiet was working on the USS Missouri. Therefore, to the extent that Hobson's affidavits suggest that during the relevant time period the Navy prohibited warnings concerning the dangers of asbestos, the statements are without foundation—and therefore inadmissible—as being beyond the scope of Hobson's personal knowledge and experience.[18]

### 2. Admiral Ben J. Lehman's Affidavit

*Second,* GE has submitted the affidavit of Ben J. Lehman ("Lehman"), a retired Rear Admiral of the U.S. Navy, who served as a ship superintendent for repairs at the Brooklyn Navy Yard between 1942

---

14. Hobson 3 ¶¶ 4–5.

15. Nesbiet Mem. at 7–16.

16. *See* Continued Deposition under Oral Examination of David Hobson on July 21, 2004, Ex. B. to Affidavit of Bryan Belasky ("Belasky"), Counsel to Nesbiet, at 217–18.

17. After his deposition, Hobson submitted two additional sworn affidavits: Hobson 3 and 4. In the first of these, Hobson asserts that "[b]y virtue of the knowledge I have obtained over the course of my career concerning the historical practice of GE and the U.S. Navy with regard to marine steam turbines, I can state that the practices described in my October 17, 2003 affidavit [Hobson 2] concerning the U.S. Navy's control and direction related to marine steam turbines

would have been applicable at least as far back in time as World War II." Hobson 3 ¶ 2. This assertion is insufficient to establish personal knowledge with regard to whether a particular kind of warning was forbidden over twenty years prior to the start of Hobson's career.

18. Nesbiet has requested an opportunity to depose Hobson concerning his last two affidavits. This request was granted. As of the date of this opinion, however, Nesbiet has not yet been able to further depose Hobson. Nonetheless, because this Court has concluded that Hobson cannot offer competent evidence concerning the Navy's control over asbestos-related warnings during the relevant time period, Nesbiet is in no way prejudiced by his inability to depose Hobson a second time.

and 1944.[19] In that capacity, Lehman "was personally involved with the supervision or oversight of ship alterations and equipment overhauls."[20] Lehman's affidavit states, in relevant part:

> In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings.... This control included the decision of what warnings should or should not be included.... Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all ... safety and hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of the hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the ... warnings associated with its ships and did not permit deviation from any of its contractors.[21]

The affidavit thus raises the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning.

Plaintiff deposed Lehman concerning the foundation for the statements contained in his affidavit. Based on this deposition, plaintiff contends that Lehman, like Hobson, has no personal knowledge of the relevant facts.[22] In that deposition, however, plaintiff did not attack Lehman's competence to make the statements in his affidavit. Rather, plaintiff attacks Lehman's conclusion by asserting that he lacks direct knowledge of warnings or instructions on GE's marine steam turbines in the 1940s. While the deposition reveals that Lehman has no direct knowledge as to whether the Navy specifically prohibited GE, or other manufacturers, from providing warnings about asbestos,[23] Lehman made no such assertion in his affidavit. But, as stated earlier, his affidavit raises the *inference* that the Navy prohibited warnings about asbestos because, based on Lehman's knowledge and experience, the Navy exercised *complete* control over *all* warnings placed on equipment or in accompanying technical manuals by its contractors. By virtue of the position he occupied at the Brooklyn Navy Yard during the relevant time period, Lehman is competent to make the statements contained in his affidavit.

Nesbiet further contests the factual basis for Lehman's affidavit by submitting a number of military specifications, or "milspecs," covering the contents of instruction manuals for electrical and mechanical equipment,[24] which Nesbiet contends "imposed an affirmative requirement to warn on contractors such as GE since at least the 1950s and possibly even earlier."[25] However, Nesbiet has mischaracterized

---

19. *See* Affidavit of Admiral Ben J. Lehman ("Lehman Aff."), Ex. 6 to GE Opp., ¶ 1.

20. *Id.* ¶ 3.

21. *Id.* ¶¶ 4–5.

22. *See* 3/24/05 Letter of Belasky to the Court, at 1.

23. *See* Deposition of Ben Lehman at 32, 77–78, 103–04.

24. *See* Military Specifications, MIL–M–15071A–G, Exs. C through I to Affidavit of Bryan Belasky ("Belasky Aff."), Counsel to Nesbiet.

25. Nesbiet Mem. at 15. Nesbiet proffers that he has been unable to locate the milspec that was in force during WWII. *See id.* at 16 n. 5.

this so-called requirement. For example, the earliest of these milspecs, dated October 20, 1952, states that an instruction manual "shall contain data such as the following: (a) Safety notice (where high voltages or special hazards are involved) (see figure 9)."[26] "Figure 9" itself consists of detailed instructions on how to safely handle equipment that involves high voltages.[27] If anything, the milspec requires that the manufacturer provide safety instructions, such as those regarding high voltages, *as dictated by the Navy*. Moreover, the 1952 milspec indicates that the content of instruction manuals is subject to the approval of the Navy.[28] Therefore, these milspecs appear to support, rather than undercut, Lehman's affidavit.

In sum, Lehman's affidavit establishes, for the purposes of this motion, that the Navy controlled the nature of warnings to be included on all equipment (or in the accompanying technical manuals) to be installed on its ships. This evidence in turn supports the inference that no warnings appeared on the turbines or in the written materials because the Navy prohibited them.

### 3. Dr. Lawrence Stillwell Betts's Affidavit

*Third,* GE has submitted the affidavit of Lawrence Stillwell Betts ("Betts"), a medical doctor and retired U.S. Navy Captain. During his Navy career, which began in 1971 and ended in 2001, Betts became a "qualified surface warfare medical department officer," in which capacity he became "generally familiar with the industrial products that were used by the Navy."[29] Through his training and experience, Betts is also familiar with "the history and practice of the Navy occupational health program from … before World War II until the present time."[30] Betts has supported his conclusions by attaching to his affidavit numerous journal articles, reports, and other documents dating back to before World War II.

Betts's testimony indicates that the Navy's knowledge of the health hazards associated with the use of asbestos aboard Navy vessels during the 1940s represented the state-of-the-art.[31] Consequently, according to Betts's affidavit, GE could not have possessed any information regarding the dangers posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.[32]

## II. APPLICABLE LAW

Section 1442(a) of Title 28 provides, in relevant part:

A civil action or criminal prosecution commenced in a State court against any

---

**26.** Interim Military Specification, MIL–M–15071A ("1952 Milspec"), Ex. I to Belasky Aff., at 5. The second oldest of the milspecs submitted by Nesbiet, dated August 18, 1954, contains identical language to that found in the 1952 milspec. *See* Military Specification, MIL–M–15071B, Ex. H to Belasky Aff., at 6.

**27.** *See* 1952 Milspec at fig. 9. (stating, for example, "MAKE SURE YOU ARE NOT GROUNDED whenever you are adjusting equipment or using measuring equipment. . . . In general, USE ONE HAND ONLY when servicing live equipment.").

**28.** *See id.* at 4 ("Prior to the printing of the final instruction books, a preliminary instruction book shall be prepared and submitted in duplicate to the bureau or agency concerned via the Government inspector for approval.").

**29.** Affidavit of Lawrence Stillwell Betts ("Betts Aff."), Ex. 5 to GE Opp., ¶ 1; Curriculum Vitae of Lawrence Stillwell Betts, Ex. A to Betts Aff., at 2–3.

**30.** *Id.* ¶ 2.

**31.** *See id.* ¶ 31.

**32.** *See id.* ¶¶ 30–31.

of the following may be removed by them to the district of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any other person acting under that officer) of the United States or of any agency thereof, sued in an official capacity for any act under color of such office.

This statute overcomes the well-pleaded complaint rule by providing a method to remove a case brought in state court against a federal officer, or any person acting under a federal officer, despite the absence of a federal cause of action.[33] The Supreme Court has noted that one of the purposes of the federal officer removal statute is to ensure that a federal court will adjudicate the validity of a defendant's official immunity defense.[34] To remove a state court action under the statute, a private party must establish that (1) it has a colorable federal defense, (2) it acted under the direction of a federal agency or officer, and (3) there is a causal nexus between the claims and the conduct performed under the color of federal office.[35]

A defendant seeking removal bears the burden of demonstrating federal subject matter jurisdiction.[36] Although federal courts generally construe the removal statutes narrowly, remanding doubtful cases to state court,[37] the Supreme Court has emphasized that "the federal officer removal statute is not narrow or limited."[38] Indeed, "the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'"[39] Furthermore, "it is axiomatic that the right of the states, consistently with the Constitution and the laws of the United States, to make and enforce their own laws is equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it. The [federal officer] removal statute ... is to be considered with highest regard for such equality."[40]

The first requirement for federal officer removal—a colorable federal defense—is broadly construed. "We ... do not require the officer virtually to 'win his case before he can have it removed.'"[41] Thus, a defense may be colorable even if the

33. See Jefferson County v. Acker, 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999).

34. Arizona v. Manypenny, 451 U.S. 232, 242, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981).

35. See id.; Mesa v. California, 489 U.S. 121, 124–25, 134–36, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). A corporation is a "person" within the meaning of section 1442(a). See, e.g., Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387 (5th Cir.1998); McGillick v. World Trade Ctr. Props., LLC, No. 04 Civ. 3747, 2004 WL 2049260, at *2 (S.D.N.Y. Sept.13, 2004); Isaacson v. Dow Chem. Co., 304 F.Supp.2d 442, 447 (E.D.N.Y.2004); Arness v. Boeing N. Am., Inc., 997 F.Supp. 1268, 1272 (C.D.Cal.1998); Good v. Armstrong World Indus., 914 F.Supp. 1125, 1127–28 (E.D.Pa.1996).

36. See California Pub. Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 100 (2d Cir. 2004).

37. See Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 31, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002); Somlyo v. J. Lu–Rob Enters., Inc., 932 F.2d 1043, 1045–46 (2d Cir.1991).

38. Willingham v. Morgan, 395 U.S. 402, 406, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) (quotation marks omitted).

39. Manypenny, 451 U.S. at 242, 101 S.Ct. 1657 (quoting Willingham, 395 U.S. at 407, 89 S.Ct. 1813).

40. State of Colorado v. Symes, 286 U.S. 510, 518, 52 S.Ct. 635, 76 L.Ed. 1253 (1932).

41. Jefferson County, 527 U.S. at 431, 119 S.Ct. 2069 (quoting Willingham, 395 U.S. at 407, 89 S.Ct. 1813).

court ultimately rejects it.[42] "[A]t the removal stage, it is not the Court's role to assess the validity of a particular defense. The Supreme Court made it clear in [*Willingham v. Morgan*[43]] that the phrase 'under color of . . . office' allows removal even if, on the record then existing, it could not be said that 'the officers had a clearly sustainable defense.' "[44]

A defendant meets the second requirement—acting under the direction of a federal officer—by showing a "substantial degree of direct and detailed federal control over the defendant's work."[45] By contrast, a person or corporation establishing only that the relevant acts occurred under the general auspices of a federal agency or officer is not entitled to removal under section 1442(a).[46] "Courts generally have not found jurisdiction where the government officer did not directly require a purported agent to take specific actions."[47]

Finally, to satisfy the third requirement—the existence of a causal nexus—the defendant must show that the state lawsuit "has arisen out of the acts done by [the defendant] under color of federal authority and in enforcement of federal law."[48] In the context of a failure to warn claim, the defendant must establish that the government's control over warnings directly interfered with the defendant's ability to fulfill its state law obligation to warn of safety hazards.[49]

## III. DISCUSSION

### A. "Colorable Federal Defense" Requirement

GE asserts the military contractor defense.[50] This defense shields contractors from liability under state tort law for defects in military equipment supplied to the United States when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."[51] In the context of a failure-to-

---

**42.** *See id.*

**43.** 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396.

**44.** *Reiser v. Fitzmaurice*, No. 94 Civ. 7512, 1994 WL 54326, at *3 (S.D.N.Y. Feb. 8, 1996) (alteration in original). *See also Symes*, 286 U.S. at 519, 52 S.Ct. 635 (when a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith").

**45.** *Isaacson*, 304 F.Supp.2d at 447.

**46.** *See Ryan v. Dow Chem. Co.*, 781 F.Supp. 934, 947 (E.D.N.Y.1992); *Good*, 914 F.Supp. at 1128.

**47.** *McGillick*, 2004 WL 2049260, at *3.

**48.** *Mesa*, 489 U.S. at 131–32, 109 S.Ct. 959.

**49.** *See Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F.Supp.2d 1144, 1155 (D.Colo.2002) ("What [the defendants] must establish for purpose of . . . § 1442(a)(1) is that the government authority under which they worked required them to act as they did. For purposes of [p]laintiff's failure to warn claims . . . [the defendants] must establish [that the government's] direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards."); *Faulk v. Owens–Corning Fiberglass Corp.*, 48 F.Supp.2d 653, 663 (E.D.Tex.1999) (holding that the causal nexus requirement of the federal officer removal statute was not satisfied "[b]ecause the federal government provided no direction or control on warnings, when using asbestos [and] did not prevent [d]efendants from taking their own safety precautions heeding state-law standards").

**50.** *See GE Mem. at 12.*

**51.** *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). *See also Grispo v. Eagle–Picher Indus., Inc.*, 897 F.2d 626, 629 (2d Cir.1990) (holding that the *Boyle* test may apply to a state law failure-to-warn claim).

warn claim, the Second Circuit has held that in order to satisfy the first element of the military contractor defense, the defendant must show that the government itself dictated or otherwise controlled the content of the warnings meant to accompany the product.[52]

In order to satisfy the first prong of section 1442(a), GE must demonstrate merely that its claim to the military contractor defense is "colorable." GE has met this burden. *First*, the Lehman affidavit establishes for the purposes of this motion that the Navy's specifications controlled all aspects of the design and manufacture of marine steam turbines, including the nature of warnings to be affixed to or included with these turbines.[53] *Second*, Lehman asserts that any deviation from these specifications would likely have resulted in rejection of the equipment.[54] This proffer is sufficient, for the purpose of the "colorable defense" prong, to satisfy the requirement that the equipment and accompanying warnings, if any, conformed to the Navy's specifications. *Third*, Betts's affidavit establishes that the Navy's knowledge of the dangers of asbestos on board its ships was state-of-the-art and, therefore, the Navy would have known of any dangers that were known to GE.[55] Thus, GE has shown it has a colorable federal defense.

### B. "Acting Under" and "Causal Nexus" Requirements

As stated earlier, GE's proffer has established that the Navy determined the nature of warnings to be included on the turbines and in the accompanying technical manuals and, furthermore, did not permit contractors to deviate from any of its specifications. This evidence in turn raises an inference that GE's alleged failure to warn of the dangers of asbestos resulted from the Navy's prohibition of any such warning. Nesbiet has not effectively rebutted this inference with any evidence of his own. In fact, the milspecs submitted by Nesbiet support rather than undermine GE's evidence. GE's proffer thus establishes, for the purposes of this motion, that (1) the Navy exercised a substantial degree of direct and detailed control over GE's provision of warnings and (2) the Navy's control over warnings directly interfered with GE's ability to fulfill its state law obligation to warn about the dangers of asbestos. GE has therefore satisfied "acting under" and "causal nexus" requirements under section 1442(a).[56]

Nesbiet suggests that in order to meet the "causal nexus" requirement GE must provide direct evidence that the Navy "specifically prohibited it from warning about asbestos."[57] This is more than GE is required to do. The Supreme Court has admonished, "[j]ust as requiring a 'clearly

---

52. *See Grispo,* 897 F.2d at 630.

53. *See* Lehman Aff. ¶¶ 4–5.

54. *See id.* ¶¶ 3, 5.

55. *See* Betts Aff. ¶ 31.

56. *See Carter v. Acands, Inc.,* No. 3:02–CV–00009, 2002 WL 31682352, at *4 (E.D.Tex. June 27, 2002) (holding in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that the "acting under" requirement of the federal officer removal statute was satisfied because the Navy had ultimate control over warnings affixed to equipment or included in the accompanying written materials); *Madden v. Able Supply Co.,* 205 F.Supp.2d 695, 702 (S.D.Tex.2002) (stating in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that "any warnings promulgated (or not promulgated) with respect to the turbines were governed by Navy guidelines. Thus, the causal nexus is axiomatic.").

57. Reply Memorandum of Law in Further Support of Plaintiff's Motion to Remand at 5.

sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute ... so would demanding an airtight case on the merits [of the defendant's claim to official immunity] in order to show the required causal connection."[58] Moreover, the cases cited by Nesbiet in support its position are distinguishable from this case for the simple reason that in each of those cases, the court found that the defendant had produced *no* evidence—direct or circumstantial—supporting a causal nexus. For instance, in *Faulk v. Owens–Corning Fiberglass Corp.*,[59] which involved a failure-to-warn claim arising from the plaintiffs' exposure to asbestos at a job site where the defendants manufactured various products for the federal government, the defendants supported removal under section 1442(a) by arguing that they could not have constructed or operated their manufacturing facility without using asbestos insulation.[60] The court found this assertion to be irrelevant because whether or not there was a comparable insulating product that did not include asbestos, the "myriad of documents" submitted by the defendants did not show "direction or control by the federal officer relating to *warning[s]* ... about asbestos."[61] Thus, the defendants had failed to present *any* evidence to satisfy the "causal nexus" prong.[62] By contrast, in this case, GE has established, albeit circumstantially, that the Navy prohibited GE from providing warnings. GE's evidence is not airtight, but it is sufficient for the purposes of section 1442(a) to demonstrate that the Navy's control over warnings directly interfered with GE's duty to warn under state law. Thus, GE has satisfied the "causal nexus" requirement.

In sum, GE has met each of the three requirements under section 1442(a), and removal of this case to federal court is therefore proper.

## IV. CONCLUSION

For the foregoing reasons, Nesbiet's motion to remand this action to state court is denied. GE's motion to stay all proceedings in this Court pending a decision by the Judicial Panel on Multidistrict Litigation whether to transfer this case to the Eastern District of Pennsylvania is moot. The Clerk of the Court is directed to close these motions (docket # 5 and # 7).

SO ORDERED.

---

58. *Jefferson County*, 527 U.S. at 432, 119 S.Ct. 2069 (citation omitted).

59. 48 F.Supp.2d 653.

60. *See id.* at 662 n. 12.

61. *Id.* at 664 (emphasis added).

62. *Cf. Gauthe v. Asbestos Corp.*, No. Civ. A. 96–2454, 1997 WL 3255, at *3 (E.D.La. Jan.2, 1997) (holding in a failure-to-warn case arising from the plaintiffs' exposure to asbestos at the defendant's shipyard, where ships were constructed for the Navy, that the "causal nexus" requirement had not been satisfied because "[t]here is no evidence that the Government restricted or prohibited [defendant's] ability to notify individuals of the presence of asbestos in the work environment"); *Overly v. Raybestos–Manhattan*, No. C–96–2853 SI, 1996 WL 532150, at *4 (N.D.Cal. Sept.9, 1996) (holding in a case involving nearly identical facts to those in *Gauthe* that the defendant failed to satisfy the requirements of section 1442(a) because the defendant's "only showing on this motion relates to the government's manufacturing and engineering specifications").